IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| FORT BELKNAP INDIAN COMMUNITY,<br><br>Plaintiff,<br>vs.<br><br>UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF INTERIOR, DEB HAALAND, in her official capacity as United States Secretary of the Interior, BRYAN NEWLAND, in his official capacity as Acting Assistant Secretary of the Interior for Indian Affairs, DARYL LaCOUNTE, Director of the Bureau of Indian Affairs, RICHARD GLEN MELVILLE, in his official capacity as Acting Bureau Director, Office of Justice Services, and LENORA NIOCE, in her official capacity as Bureau of Indian Affairs Special Agent in Charge/Approving Official,<br><br>Defendants. | CV 22-103-GF-JTJ<br><br>FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER |

Plaintiff, Fort Belknap Indian Community ("FBIC"), a federally recognized Indian tribe, brought this action against Defendants, United States Of America, United States Department Of Interior, Deb Haaland, in her official

capacity as United States Secretary of the Interior, Bryan Newland, in his official capacity as Acting Assistant Secretary of the Interior for Indian Affairs, Daryl LaCounte, Director of the Bureau of Indian Affairs, Richard Glen Melville, in his official capacity as Acting Bureau Director, Office of Justice Services, and Lenora Nioce, in her official capacity as Bureau of Indian Affairs Special Agent in Charge/Approving Official, (Defendants) alleging Count I: Breach of Statutory Duty and Count 2: Breach of Contract. FBIC's claims are each based on its contention that its law enforcement program, operated pursuant to a self-determination contract under the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. §§ 5301 et seq. has been underfunded for the years between FY 2016-FY2022. (Doc. 95).

A bench trial was held on March 3 and 4, 2026. At the conclusion of the trial, the Court ordered the parties to file post-trial Findings of Fact and Conclusions of Law. (FCL) (Doc. 126). FBIC and USA each filed their FCLs on June 25, 2026. (Docs. 155 and 156). Upon review of the parties' post-trial FCL's, the Court ordered the parties to submit supplemental calculations from their respective experts showing how FBIC's funding would change by correcting the FBIC's land base. The parties filed their respective supplemental reports on October 9, 2026. (Docs. 162 and 164).

Based upon the testimony, exhibits, and arguments presented at trial, the Court enters the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(1)(a).

## FINDINGS OF FACT

### Background

1. Plaintiff Fort Belknap Indian Community, (FBIC) is a federally recognized Indian Tribe located within the Fort Belnap Indian Reservation headquartered in Harlem, Montana. (Doc. 86, ¶ 1).

2. The Office of Justice Services (OJS) was established within the Bureau of Indian Affairs (BIA) under the Indian Law Enforcement Reform Act of 1990, 25 U.S.C. §§ 2801et seq., and has authority to operate or contract with federally recognized tribes for law enforcement services under the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. §§ 5301–5332 and Public Law 93-638.

3. OJS currently funds and operates or oversees 198 law enforcement programs, approximately 26 of which are operated by OJS as direct service operations, where BIA employees perform law enforcement services for the tribe; and approximately 164 (or portions thereof) of which are operated by tribes under contracts or self-governance compacts pursuant to Title I and Title IV of the ISDEAA, 25 U.S.C. § 5301 *et seq*. Addington, Trial Tr., Vol. 1, 23:4–15).

4. At all times relevant to this litigation, FBIC operated its law enforcement program, consisting of uniform police, dispatch, criminal investigations and administrative functions, pursuant to self-determination contracts containing Annual Funding Agreements ("AFAs") under the ISDEAA, 25 U.S.C. §§ 5301–5332. Addington, Trial, Tr., Vol. 1, 26: 15-21.

**Tribal Law and Order Act**

5. The Tribal Law and Order Act (TLOA) of 2010, Pub. L. 111-211, Title II, 124 Stat. 2261, requires OJS to submit an annual report to congressional appropriations committees that quantifies the overall public safety program needs of Indian Country. OJS has prepared and submitted this report for each fiscal year from 2011 to 2021. The 2021 TLOA report, which is the most recent report, was published in 2024. The reports are published on BIA's website and are presented during annual tribal consultations for BIA's budget development. (Doc. 83 at ¶ 6; Addington, Trial Tr., Vol. 1, 33:25–34:7; Martin, Trial Tr., Vol. 1, 72:3–13, 89:1–7; Exhibit 5.)

6. The TLOA report methodology uses scalable budget models and applies operation benchmarks—specifically the U.S. Department of Justice (DOJ) benchmark of 2.8 officers per thousand members of the service population—to estimate need. (Doc. 83 at ¶ 7; Addington, Trial Tr., Vol. 1, 34:8–13; Martin, Trial Tr., Vol. 1, 73:15–19; Exhibit 5.)

7. The TLOA methodology starts by grouping tribes by population size and then models for each population size group, a budget amount to serve that tribe and an FTE for that size tribe. The number of patrol officers is based on the DOJ benchmark of 2.8 officers per thousand members of the service population, estimated based on the midpoint of the population range. Modeled budgets are increased each year with inflation. (Martin, Trial Tr., Vol. 1, 73:20–24; Martin, Trial Tr., Vol. 2, 428:13-20; Exhibits 5, 55.)

8. The resulting estimates of law enforcement need from the TLOA methodology represent the approximate cost of a fully staffed, fully funded program for law enforcement. Very few tribes, including both contracting tribes and direct service tribes, receive sufficient funding to fully meet their law enforcement need, as estimated by the TLOA methodology. (Martin, Trial Tr., Vol. 1, 77:3–9; Martin, Trial Tr., Vol. 2, 414:12–415:14.)

**Indian Self-Determination Education Assistance Act**

9. OJS programs are subject to ISDEAA, which directs OJS to enter into a self-determination contract upon the request of a tribe. 25 U.S.C. § 5321(a)(1). Tribes with self-determination contracts are responsible for the day-to-day operation of their law enforcement programs, with OJS providing technical assistance and periodic program reviews. For other tribes, OJS provides direct service with federal law enforcement officers and support staff providing law

enforcement services for such tribes. (Addington, Trial Tr., Vol. 1, 22:2–19, 24:8–25:20.)

10. ISDEAA mandates that contract amounts "shall not be less than the Secretary would have otherwise provided for the operation of the programs" under contract. 25 U.S.C. § 5325(a)(1). BIA commonly refers to this amount as the "Secretarial Amount." (Addington, Trial Tr., Vol. 1, 25:23–26:7, 27:9–17; Martin, Trial Tr., Vol. 1, 89:24–90:3.) OJS' AFAs with a contracting tribe encompasses the Secretarial Amount.

11. ISDEAA further mandates that contract amounts "shall not be reduced . . . in subsequent years" except in limited circumstances defined by statute. 25 U.S.C. § 5325(b)(2). This statutory restriction also means that BIA cannot take from one tribe's contract to fund another tribe's contract. (Addington, Trial Tr., Vol. 1, 27:18–21, 28:8–12; Martin, Trial Tr., Vol. 1, 71:10–15, 89:24–90:3.)

**Tribal Priority Allocation**

12. Prior to 1999, funding for the Bureau of Indian Affairs' (BIA) law enforcement programs was allocated as part of the Tribal Priority Allocation (TPA) process. The TPA is a lump sum allocation allowing tribes to move money in between different programs and services based upon the tribe's priorities. (Addington, Trial Tr., Vol. 1, 35:6–25.)

13. In 1999, Congress directed that law enforcement programs be removed from the TPA program. The amount of TPA funding that tribes allocated to law enforcement programs in 1999, then became the base funding amount (the budgeted amount to operate a program) used by the OJS for each tribe's future annual base funding levels for law enforcement going forward. Beginning in 2000, through the present, OJS has used prior-year amounts as the starting part for its funding allocations for direct serve locations and contracting tribes alike. (Addington, Trial Tr., Vol. 1, 26:1-5; 36:18–37:4; Martin, Trial Tr., Vol. 1, 146:11–147:21; Exhibit 524 at ¶ 20.)

14. OJS's Deputy Associate Director Kevin Martin (Martin) testified that when OJS allocated funds to contracting tribes in 2000, after the removal of law enforcement programs from the TPA in 1999, it would have allocated the exact same funds in the same manner if OJS were operating law enforcement services directly for these tribes. (Martin, Trial Tr., Vol. 1, 147:11-14).

15. Contracting tribes may increase their base funding level for law enforcement by reallocating unrestricted funds from TPA programs into law enforcement through a base transfer request. (Addington, Trial Tr., Vol 1, 36L1-7, 37:14-19, Martin, Trial Tr., Vol. 1, 148:2-9, Exhibit 525 at ¶39).

**OJS Funding Methodology**

16. Congress appropriates money to BIA for the "Operation of Indian Programs" in an annual lump-sum appropriation. Nearly all BIA programs are funded from this single appropriation Within this lump-sum appropriation, Congress further directs appropriations through explanatory statements and committee reports. Congress identifies an amount for public safety and justice programs, which includes an amount for criminal investigations and police services. From that amount, Congress directed various amounts for specified purposes, including an allocation for tribes affected by the *McGirt v. Oklahoma*, 591 U.S. 894 (2020) decision as well as dedicated amounts for missing and murdered cases, drug enforcement, and unserved tribes, among others. (Doc. 83 at ¶ 20; Addington, Trial Tr., Vol. 1, 31:19–32:11, 33:12–15; Martin, Trial Tr., Vol. 1, 68:6–12, 68:25–70:16, 71:3–9; Exhibits 522, 523.)

17. When Congress appropriates a general unrestricted increase, OJS uses a funding formula to allocate that increase to tribes on top of their prior year base amounts. OJS applies the formula to all tribes, without regard to whether a tribe is a direct-service tribe or a contracting tribe. The OJS funding formula uses objective, weighted criteria based on: (1) reported violent crime rates (35 percent weight); (2) unmet program need estimated using the TLOA Report methodology (35 percent); (3) size of trust land base in service area (20 percent); and pro-rata

based on the existing base amounts (10 percent). To estimate reported violent crime rates, OJS relies on data from DOJ's National Incident Based Reporting System (NIBRS). To estimate the size of the trust land base in each service area, OJS uses land tenure data maintained in the BIA Trust Asset Accounting Management System (TAAMS). OJS additionally provides fixed-cost increases to both contracting tribes and direct-service agencies. (Doc. 83 at ¶ 22; Addington, Trial Tr., Vol. 1, 38:8–39:2; Martin, Trial Tr., Vol. 1, 78:6–24, 82:8–23, 83:12–85:1, 151:19–152:22; Martin Trial Tr., Vol. 2, 425:7–13; Exhibits 2, 5, 533, 548.)

18. OJS publishes its formula criteria in the TLOA Report and regularly communicates it to tribes, including during quarterly budget consultation meetings held by the Tribal-Interior Budget Council. (Doc. 83 at ¶ 23; Martin, Trial Tr., Vol. 1, 86:12–89:17; Exhibits 5, 529.)

19. Application of the OJS funding formula is not required by statute, regulation, or appropriations language. It is applied at the discretion of OJS. (Doc. 83 at ¶ 24; Addington, Trial Tr., Vol. 1, 33:12–15, 37:25–38:6; Martin, Trial Tr., Vol. 1, 84:12–85:1.)

20. When a tribe enters into a contract with the OJS under the ISDEAA, the contract takes the form of the statutory model contract with an attached AFA that outlines program requirements and annual funding amounts. Near the end of each fiscal year, contracting tribes submit proposed funding agreements for the coming

fiscal year, and BIA reviews these proposals according to procedures and deadlines established by law. If BIA has to issue a funding decision prior to enactment of a full-year appropriation, BIA will approve or partially approve any AFA up to the Secretarial Amount provided for the prior fiscal year and will decline or partially decline any request in excess of that amount. Once a full-year appropriation is enacted, BIA distributes any increases provided by Congress. (Addington, Trial Tr., Vol. 1, 27:22–28:7, 29:6–29:11, 47:7–17; Martin, Trial Tr., Vol. 1, 98:7–17, 103:10–18.)

21. Due to the ISDEAA mandate set forth in 25 U.S.C §5325(b)(2), providing that contract amounts "shall not be reduced in subsequent years" except in limited circumstances, nearly all BIA programs use historical amounts allocated for each tribe (i.e., the amount allocated to each contracting tribe or direct-service agency in the prior year) to determine the current allocation (base funding) for each contracting tribe or direct-service agency. OJS determines the Secretarial Amount for a self-determination contract each year by taking the prior year's base funding level and adding to it any increases provided by Congress. Only for the first year that a tribe enters into a self-determination contract does BIA have prior-year figures of actual expenditures made by the Secretary for the program to be contracted. In each subsequent year, BIA determines only increases to that initial amount by applying the same formula or methodology to contracting and direct-

service tribes alike. (Addington, Trial Tr., Vol. 1, 27:18-21, 29:12–30:21; Martin, Trial Tr., Vol. 1, 71: 10-15, 90:13–91:11.)

22. BIA provides in its annual Budget Justifications (also known as the Greenbook) a table listing the base levels of funding for criminal investigations and police services for both contracting tribes and direct-service agencies for the prior fiscal year, or for the latest fiscal year for which enacted levels are available. By providing these reference tables, BIA assists Congress in understanding the nature of these recurring base funding commitments over which BIA does not exercise discretion year to year. (Doc. 83 at ¶ 16; Addington, Trial Tr Vol 1, 31:3-18; Martin, Trial Tr. Vol. 1, 126:8–127:10.)

23. Each tribe, whether a contracting tribe or a direct service agency, has differing circumstances leading to differing levels of base funding across the tribes. These factors include varying population sizes, service areas, crime rates, geographical constraints, unmet need, and each tribe's or agency's TPA funding allocation in 1999. (Addington, Trial Tr., Vol. 2, 378:23–379:10; Martin, Trial Tr., Vol. 2, 394:4–395:2; Exhibit 524 at ¶¶ 37–38.)

24. Unlike contracting tribes, there is no statutory prohibition of reducing funding amounts for direct-service tribes in subsequent years. Although it is generally the practice of the BIA to maintain historical amounts for direct-service tribes from year to year, OJS retains discretion to reallocate funding among direct-

service operations. It is not uncommon for some direct-service budgets to increase at rates greater than those of contracting tribes as funds are reallocated to those tribes from other direct-service tribes. At the same time, those other direct-service base budgets will necessarily decrease from one year to the next. (Doc. 83 at ¶ 25; Martin, Trial Tr., Vol. 1, 126:5–7.)

25. If a tribe currently receiving OJS direct service submits a contract proposal, the Secretarial Amount of that contract is determined based on the most recent years of direct-service allocations and expenditures. (Doc. 83 at ¶ 25; Addington, Trial Tr., Vol. 1, 29:12–23.)

26. On the other hand, it is rare for contracting tribes to retrocede law enforcement programs back to OJS. Over the past decade, only five tribes have retroceded criminal investigations and police services programs. When retrocession does occur, OJS takes the contract amount as its starting budget for the retroceded program. OJS may then reallocate funds to or from the retroceded program within the pool of other direct-service agencies. (Doc. 83 at ¶ 26; Addington, Trial Tr., Vol. 2, 385:5–7, 385:16–386:1; Martin, Trial Tr., Vol. 2, 431:10–432:16; Exhibits 1, 525 at ¶ 48.)

**Underfunding Evidence**

27. FBIC's Second Amended Complaint contends its law enforcement programs were underfunded for the years from FY 2016 to FY2022.

28. Other than the years, 2018, 2023, and 2026, in which OJS issued a partial declination of Fort Belknap's annual funding requests, Fort Belknap received the funding it had proposed to OJS. (Martin, Trial Tr., Vol. 1, 101:22–102:16, 107:15–20; Exhibits 518, 519, 578, 580.)

29. 25 U.S.C. § 5321(e)(l) places the burden of proof for declining a contract proposal upon the BIA through the Secretary holding that the "Secretary shall have the burden of proof to establish by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof)."

30. FBIC presented fact and expert testimony challenging the United States' assertion that OJS had valid grounds for partially declining FBIC's law enforcement funding proposals from 2016 through 2024.

31. Natalya Abdrasilova, CPA, FBIC's financial expert witness, offered testimony by presenting two different models intended to show a discrepancy between the law enforcement funding FBIC has received and that received by other direct service tribes. (Abdrasilova, Trial Tr., Vol. 2, 357:10–16.)

32. In one model, Ms. Abdrasilova's calculated a Secretarial Amount using BIA/staffing wage data. Abdrasilova identified median staffing levels for various direct service agencies at 2.45 to 2.81 FTE/1000 and then compared those to a proposed staffing level for FBIC and concluded FBIC should have a staffing level

of 20.35 to 23.34. Ms. Abdrasilova used this staffing level to calculate a proposed budget for FBIC, concluding FBIC was underfunded by $10,274,348 for the years 2016-2024. Abdrasilova, Trial Tr., Vol. 2, 347:4-6.

Ms. Abdrasilova's analysis included Standing Rock and Wind River, the only two agencies with staffing levels near 20.35 and 23.35 but did not take into account the sizable difference in population between FBIC (8,308), Standing Rock (16,102) and Wind River (14,969), or the difference in acreage between FBIC (670,000 to 690,000), Standing Rock (2.3 million) and Wind River (2.2 million). Ms. Abdrasilova's conclusion also included two agencies, Truxton Canyon, located at the bottom of the Grand Canyon, and Western Nevada, a multi-tribe agency with a population of 760. Martin testified that removing these two agencies would reduce the median from the 2.45 to 2.81 FTE/1000 range to 1.5. (Abdrasilova, Trial Tr., Vol. 2, 362:2-8, 365:24–367:15, 369:5–25; Martin, Trial Tr., Vol. 2, 402:10–404:6, 405:19–406:1; Exhibit 68 at p. 26-28.)

33. In another model, Ms. Abdrasilova compared the Secretarial Amount for the FBIC's law enforcement funding to the Secretarial Amount for three direct-service agencies, Mescalero, Ute Mountain Ute, and Ft. Totten (Spirit Lake), for the period 2014 to 2024. Ms. Abdrasilova testified that the criterion she used for comparability was land base and service population, due to these three service locations being similar in population and acreage to FBIC. Ms. Abdrasilova then

compared FBIC's Secretarial Amount to the median Secretarial Amount for these three tribes and calculated an underpayment to FBIC for each of the years, resulting in a total underpayment of $11,733.856. (Abdrasilova, Trial Tr., Vol. 2, 340:20–341:11, 342:11–25, 347:4-6, 362:9–25, 364:1-6; Exhibit 68 at p. 24.)

34. Ms. Abdrasilova analysis did not take into consideration whether any realignment or redistribution of law enforcement funding could be accomplished without violating appropriated funding limits. (Abdrasilova, Trial Tr., Vol. 2, 359:21-24.)

35. Martin testified that the OJS determines the Secretarial Amount by basing their funding level on the prior year's level due to the constraints of the ISDEAA, and that due to these factors and the unique circumstances that have shaped each of the comparator tribes funding levels, Ms. Abdrasilova assumption that tribes of similar size and population should have similar base funding levels is not valid. (Martin, Trial Tr., Vol. 2, 407:22–408:23.)

36. Martin testified that each of the three other direct service locations has higher funding than FBIC. However, they each started out with higher funding in 1999, which meant that the three other service locations made the decision themselves to allocate higher levels of funding for law enforcement in 1999, before law enforcement was removed from the TPA program. Martin testified that the comparative growth among these locations since 2014 does not show that OJS has

favored the three other locations compared to FBIC. FBIC's budget grew by 13.6% during this period. Ute Mountain Ute's budget grew by 2.5%, Ft. Totten's grew by 8.9%, and Mescalero grew by 21.8%. Martin concluded that this analysis, which focuses on the funding increases that OJS has discretion over, reveals no disparate or unfair treatment of FBIC compared to these other tribes. (Martin, Trial Tr., Vol. 2, 412:13–413:25; Exhibit 526 at ¶ 15.)

37. FBIC witness Gary LaMere also offered testimony suggesting that Mescalero's law enforcement budget was larger than FBIC's despite Mescalero being smaller in terms of population and acreage. The evidence, however, shows that Mescalero is a poor comparator because of its high violent crime rate, with Mescalero receiving increased staffing under the Department of Interior's High Priority Performance Goal for Safe Indian Communities. (LaMere, Trial Tr., Vol. 1, 218:16-219:8, 250:15-251:21, Addington, Trial Tr., Vol. 2, 378:23–379:10; Martin, Trial Tr., Vol. 2, 410:11–412:4, 415:15–23.)

38. Ms. Cuts the Rope testified that OJS has utilized incorrect land acreage for FBIC in its funding methodology for base funding increases. (Cuts the Rope, Trial Tr., Vol. 1, 174:17–175:9).

39. OJS does not dispute that it utilized incorrect land acreage calculating FBIC's Secretarial Amount for the FY2014-2017. (Martin Tr., Vol. 1 425:3-427:2). However, by utilizing OJS's funding methodology, this error would only

have affected the amount of FBIC's Secretarial Amount if Congress allocated unrestricted base funding increases during or after this timeframe. The only time which this occurred was in FY2022 and FY 2023. (Doc. 164, ¶ 6).

40. OJS's utilization of the incorrect land acreage under its funding methodology for the unrestricted base funding increases allocated by Congress for FY 2022, and FY2023, resulted in an underfunding of FBIC's Secretarial Amount for these fiscal years. This error, in turn, affected the FBIC's carry over Secretarial Amount for FY 2024, FY2025, and FY2026. (Doc.164, ¶ 7). Therefore, FBIC received less funding for its law enforcement program then it was entitled to receive for these fiscal years.

41. FBIC's expert, Natalya Abdrasilova, and OJS's expert, Kevin Martin each provided reports detailing their calculations, including interest, of the effect OJA's error in utilizing the incorrect land acreage had on FBIC's Secretarial Amount for FY 2014-2026. (Docs. 162 and 164).

42. As OJA only applies its funding methodology to unrestricted increases allocated by Congress, OJA's error in utilizing the incorrect land acreage did not apply to fixed cost increases, which are distributed to all tribes on a pro rata basis. (Martin, Trial Tr. Vol.1, 92:21-93:3).

43. FBIC's expert, Abdrasilova, calculated the effect of OJS's error in utilizing the incorrect land acreage by including fixed cost increases. (Doc. 162).

44. Abdrasilova's calculation utilized a 20% weight for land acreage for FY 2014-2026. However, for FY 2018-2020, OJS used a 10% weight for land acreage. (Trial Exhibit 542).

45. Abdrasilova's calculation included direct contract support costs, which are not reflected in the Secretarial Amount. (25 U.S.C. 5325(a)(2)(3)).

46. Abdrasilova's calculation included additional one-time vehicle funding provided by the BIA Rocky Mountain Region, which is organized separately from OJS, and would therefore not be included in OJS's methodology for unrestricted increases allocated by Congress. (Martin Trial Tr., Vol. 2, 447L1-448:14, 449:6-12, 452:8-18).

47. Abdrasilova calculated interest on the total amount she determined was owed using the rate determined by the Treasury through P.L. 92-41. (Doc. 162, p. 4).

48. Martin calculated the interest on the total amount he determined was owed using the Prompt Payment Act (31 U.S.C. § 3902) applied monthly. (Doc. 164, p. 7).

49. Martin and Abdrasilova's interest calculation methodologies are generally consistent. (Doc. 164, ¶ 24). The difference in the total amount of interest each party calculated was the result of each party applying their interest calculation to the total underlying amount each party determined was owed. (Id.).

50. By including fixed cost increases, an incorrect weight for land acreage for certain years, direct contract support costs, and an inapplicable one-time vehicle funding amount, Abdrasilova's overestimated the effect of OJA's error in utilizing the incorrect land acreage.

51. Abdrasilova's calculation of the amount of the underpayment, including interest, resulting from OJA's error in utilizing the incorrect land acreage of either $366,017 or $387,218 is not supported by the evidence.

52. Martin's calculation of the effect of OJS's error in utilizing the incorrect land acreage was $151,199.00, including his interest calculation, more accurately reflects the effect of OJS's error on FBIC's Secretarial Amount for FY 2022-2026.

**Wage Differential between contracting and direct service tribes**

53. Federal regulations governing BIA law enforcement contracts require that tribal law enforcement officers be compensated at levels equivalent to Bureau of Indian Affairs officers performing the same duties. 25 C.F.R. § 12.34.

54. During her testimony, Abdrasilova presented data suggesting that FBIC's law enforcement officers are compensated less than municipal police officers in certain cities in Montana and less than OJS's officers employed with direct-service operations. (Abdrasilova, Trial Tr., Vol. 2, 325:22–331:1; Addington, Trial Tr., Vol. 2, 387:6–10; Martin, Trial Tr., Vol. 2, 434:13–435:21.)

55. Martin confirmed that all compensation paid to OJS officers, including benefit contributions, is paid out of each direct service agency's budget and FBIC is free to increase the salaries and benefits for its officers. Director Addington testified that if OJS were to directly operate FBIC's law enforcement program, it would do so under the same budget but would pay its officers a higher wage than what FBIC pays, which would result in fewer officers being employed for FBIC. (Addington, Trial Tr., Vol. 2, 377:6-13, 387:6–10; Martin, Trial Tr., Vol. 2, 434:13–435:21).

**FBIC Detention Program**

56. Abdrasilova offered testimony showing that OJS spent funds on FBIC's detention program after retrocession that were beyond the previously established base funding level. FBIC contends this over-expenditure is evidence that OJS would spend more than the current base funding level for FBIC's law enforcement program if it were to operate the program directly.

The United States does not dispute that OJS spent beyond the base funding level for detention when it assumed control of FBIC's detention program. Director Addington testified, however, that FBIC's detention operation was in significant disrepair when OJS assumed control, which required significant financial expense. Addington further testified that because OJS did not have permanent staff at the FBIC detention facility, OJS was required to detail officers from other parts of the

country to FBIC so that OJS could operate the detention facility. Those details resulted in significant expense due to ongoing travel and lodging costs. (Abdrasilova, Trial Tr., Vol. 2, 348:14–19; Addington, Trial Tr., Vol. 2, 381:4–384:20.)

57. Director Addington also testified that detention operations are fundamentally different than law enforcement operations because OJS must ensure that various standards are in place to ensure that detainees' constitutional rights are not violated. These various factors illustrate that detention operations are different than law enforcement operations and make for a questionable comparison in terms of funding and expenditures by OJS. (Addington, Trial Tr., Vol. 2, 379:11–381:3, 384:21–385:4; Martin, Trial Tr., Vol. 2, 433:1–7; Exhibit 525 at ¶¶ 50–52.)

58. The United States contended that retrocessions by law enforcement programs are more relevant to this case because this case involves a law enforcement program, not a detention program. Martin testified that only five tribes retroceded their criminal investigations and police services programs in the decade before 2023. Three of those tribes were absorbed into a multi-tribe direct-service operation or ceased altogether. Of the two others, OJS-operated one within 12 percent, both above and below the Secretarial Amount, and OJS operated the other underbudget by as much as 50 percent following retrocession. (Addington,

Trail Tr., Vol. 2, 385:5–386:1; Martin, Trail Tr., Vol. 2, 431:10–432:25; Exhibit 525 at ¶¶ 46–49.)

**Violent Crime Factor**

59. Ms. Abdrasilova testified that FBIC's violent crime data was missing from OJS's funding allocation spreadsheet, which resulted in FBIC receiving less funding for 2023 than it should have. Ms. Abdrasilova also testified that she was not aware of who was responsible for reporting violent crime data to OJS, and that she did not analyze the financial or budgeting effects of the missing crime data. (Abdrasilova, Trial Tr., Vol. 2, 334:24–335:5, 361:8–16.)

60. OJS uses violent crime data collected by the National Incident-Based Reporting System (NIBRS) to calculate the violent crime rates used in the OJS funding formula. NIBRS is the only source of crime data that covers all tribes with consistent and nationally uniform reporting standards. In applying the OJS funding formula, OJS does not permit exceptions to the use of NIBRS because it would be impossible for OJS to ensure an accurate comparison among all tribes. In the absence of NIBRS crime data for a particular tribe, OJS does not apply the national average crime rate or any other placeholder crime rate because doing so would punish tribes that do report crime data to NIBRS as required but have crime rates lower than the placeholder rate. (Martin, Trial Tr., Vol. 1, 151:19–152:22, 154:19–25; Exhibit 525 at ¶ 30.)

61. Director Addington testified that, in 2020, OJS switched platforms for tribes' mandatory reporting of violent crimes. Historically, tribes reported violent crime through the FBI's Uniform Crime Reporting platform (UCR). In 2020, OJS began to transition to NIBRS. Director Addington testified—and the exhibits show—that OJS repeatedly informed FBIC of this transition to NIBRS and offered to provide technical assistance. Numerous emails and correspondence between OJS and FBIC memorialize this outreach. Despite repeated overtures from OJS, FBIC failed to make the mandatory reporting for 2021, 2022, and 2023. (Addington, Trial Tr., Vol. 2, 373:7–376:3; Exhibits 533, 548.)

62. During his testimony, FBIC Chief of Police Joshua Roberge acknowledged OJS's efforts to notify FBIC of the transition to NIBRS and OJS's offers of technical assistance. Chief Roberge testified it was FBIC's responsibility for failing to report the data to NIBRS. Chief Roberge further testified that FBIC is currently using NIBRS, and Mr. Martin testified that FBIC will benefit from that reporting in any future use of the OJS funding formula. (Roberge, Trial Tr., Vol. 2, 309:24–313:12, 314:7–23, 318:12–22; Martin, Trial Tr., Vol. 2, 427:12–17.)

63. FBIC did not provide any testimony or calculation identifying the monetary effect of the missing data. Kevin Martin testified that even if the missing data had been entered, that would not have resulted in FBIC receiving the $5.1

million in funding it requested for 2023, or any amount close to that. (Martin, Trial Tr., Vol. 2, 427:3–11.)

## CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 25 U.S.C § 5331(a).

2. In 1975, Congress enacted the ISDEAA to help Indian tribes assume responsibility for program or services that a federal agency would otherwise provide to tribes' members. 25 U.S.C §5301 et seq.

3. The ISDEAA requires the Secretary of the Department of Interior, (Secretary) upon request of a tribe or authorized tribal organization, to enter into or renew a self-determination contract with the tribe under which the tribe assumes control over federally funded programs formerly administered by the BIA for the benefit of the tribe. *See* 25 U.S.C. § 5321(a)(1). Such contracts are often referred to as "638 contracts" or "ISDEAA contracts." 25 U.S.C. § 5321. When a tribe takes over a program, it operates as a contractor and receives the money that the BIA would have otherwise spent on the program. *Los Coyotes Band of Cahuilla & Cupeño Indians v. Jewell*, 729 F.3d 1025, 1033 (9th Cir. 2013).

4. Each provision of the ISDEAA and each provision of a contract or funding agreement shall be liberally construed for the benefit of the Indian Tribe. 25 U.S.C §5301(g).

5. Generally, ISDEAA contracts include a "model contract specifying a multi-year term, with the funding amount for each year to be determined during subsequent negotiations and incorporated through annual funding agreements." *Navajo Nation v. United States Dep't of Interior* (*Navajo Nation I*), 852 F.3d 1124, 1126 (D.C. Cir. 2017) (citing 25 U.S.C. § 5329(c)). Tribes who wish to contract or renew a contract under ISDEAA annually submit proposed funding agreements to OJS for review and negotiation of the proposed terms, including the funding amount. *See* 25 C.F.R. §§ 900.8, 900.12.

6. The ISDEAA directs the Secretary to within ninety days of a tribe's proposed funding agreement to "approve the proposal and award the contract" unless the Secretary makes specific written findings that demonstrate grounds to decline the proposal pursuant to the five statutory criteria set forth in 25 U.S.C. § 5321(a)(2).

7. One of the statutory reasons the Secretary may reject a contract application is if "the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under Section 5325(a)." *See* 25 U.S.C. § 5321(a)(2)(D).

8. The ISDEAA provides that the funding for direct program expenses transferred pursuant to an ISDEAA contract "shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or

portions thereof for the period covered by the contract . . . ." 25 U.S.C. § 5325(a)(1). This amount is referred to as the "Secretarial Amount." Added to this amount are "contract support costs, which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which—normally are not carried on by the respective Secretary in his direct operation of the program; or are provided by the Secretary in support of the contracted program from resources other than those under contract. 25 U.S.C. § 5325(a)(2).

9. ISDEAA prohibits the Secretary from reducing the Secretarial Amount to make funding available for contract monitoring or administration by the Secretary or from reducing funding from one year to the next, except in limited circumstances. 25 U.S.C. § 5325(b)(2). The prior year amount thus "sets a floor, not a ceiling" on the contract amount. *Navajo Nation v. United States Dep't of Interior* (*Navajo Nation II*)*,* 57 F.4th 285, 290 (D.C. Cir. 2023). From there, the tribe may negotiate funding increase with the DOI each year and any such increase is memorialized in that year's AFA. *Id.,* citing 25 U.S.C. §§5324(c)(2), 5325(a)(3).

10. Notwithstanding any other provision of the ISDEAA, the "provision of funds under" the ISDEAA "is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities

serving a tribe to make funds available to another tribe or tribal organization" under this chapter. 25 U.S.C. § 5325(b).

11. Where only a portion of a tribe's ISDEAA contract proposal supports a declination finding, the Secretary must approve any severable portion of the proposal for which there are no statutory grounds to decline. 25 U.S.C. § 5321(a)(4). When a tribe "proposes a level of funding that is in excess of the applicable level determined under [25 U.S.C. § 5325(a)]," the Secretary may partially decline the excess amount under Section 5321(a)(4)(B). 25 U.S.C. § 5321(a)(4)(B); *see also Los Coyotes Band of Cahuilla & Cupeño Indians v. Jewell*, 729 F.3d 1025, 1035 (9th Cir. 2013).

12. A tribe may challenge a declination through a civil action. *See* 25 U.S.C. § 5331(a). In such an action, "the Secretary shall have the burden of proof to establish by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof)." 25 U.S.C. § 5321(e)(1). ISDEAA assigns the burden of proof to the Secretary for select other actions not at issue here. 25 U.S.C. §§ 5325(l)(2) (suspension, withholding, or delay in payment): 25 U.S.C § 5330, (rescinding, assuming, or reassuming a contract). For all other claims, the burden rests with Plaintiffs.

13. FBIC's Second Amended Complaint challenged the OJS's partial declination of the FBIC's FY 2022-2023 contract proposal regarding the operation

of its law enforcement program, contending the amount provided to FBIC self-determination contracts was less than what the Secretary would have provided if FBIC's law enforcement program was being operated by the OJS in violation of 25 U.S.C. § 5325(a)(1). FBIC is not challenging the payment of its contract support costs by the OJS pursuant to 25 U.S.C. § 5325(a)(2). Therefore, the holding in *Cherokee Nation v. Leavitt*, 543, U.S. 631 (2005), stating that, "where Congress had appropriated sufficient legal unrestricted funds to pay contracts in question, the government could not avoid its contractual obligation to pay *contract support costs* on grounds of insufficient appropriations" (emphasis added) is inapplicable to the issue in this case.

14. When OJS established FBIC's base funding level for FY 2022-2023, it was not allowed to reduce the base funding level from the prior year's base funding level, with the exceptions of: congressional appropriations cut; through a congressional management directive; at the request of the tribe; a change in pass-through funds under a specific contract; or if a project is completed. *See* 25 U.S.C. § 5325(b). None of these exceptions are applicable in this case.

15. OJS partially declined FBIC's proposed funding level for FY 2022-23 for the amount over its 2022 funding base, with a written explanation stating that FBIC's funding proposal was in excess of the applicable funding level for the contract as determined under 25 U.S.SC. § 5325(a) - the 2022 Secretarial Amount.

Following enactment of Congress' full year FY 23 appropriation, OJS applied the appropriation increases to FBIC, and all other direct service and contracting tribes according to its funding formula. OJS then provided funding to FBIC for FY 2022-23, by adding the 2023 congressional appropriation FBIC was entitled to under its funding formula to its 2022 basing funding amount.

16. FBIC's contention that its FY 2022-2023 Secretarial Amount should have been set at the amount FBIC proposed in its contract proposal is unsupported by the evidence. The evidence presented by FBIC's expert indicating the Secretarial Amount for FBIC should have been increased based upon a model comparing the wages for tribal law enforcement officers and those paid to BIA officers, which are required to be equivalent, pursuant. 25 C.F.R. § 12.34, was contradicted by the testimony by OJS witness, Kevin Martin, who indicated that if the FBIC law enforcement program was operated as a direct service agency, the number of officers would be reduced to comply with § 25. C.F. R. 12.34.

17. Ms. Abdrasilova's comparison of the model utilized by OJS in determining the Secretarial Amount to her separate models of determining the Secretarial Amount by developing a budget for FBIC through both a wage analysis and through a comparison of funding received by FBIC and three other direct service tribes did not take into consideration whether any realignment or redistribution of law enforcement funding could be accomplished without violating

appropriated funding limits pursuant to 25 U.S.C. § 5325(b). Ms. Abdrasilova's testimony does not support a finding that OJS would have provided a higher level of funding if it had directly operated FBIC's law enforcement program.

18. The Secretary has met his burden under ISDEAA with respect to FBIC's 2023 funding. *See* 25 U.S.C. § 5321(e)(1). The FBIC did not present sufficient evidence to show that OJS's calculation of the funding provided to FBIC would have been more if the OJS operated FBIC's law enforcement.

19. The same conclusion follows for funding FBIC received in 2016–2024. 2018 was the only year for which OJS issued a partial declination that it did not rescind. For every other year, between 2016 and 2024, FBIC received the funding it had proposed to OJS.

20. The evidence showed that OJS applied the same funding methodology to all tribes, both contracting tribes and direct service agencies. Therefore, the Secretarial Amount that OJS provided to FBIC in FY2016-FY2023, including 2018, in which OJS issued a partial declination, were the same amounts the OJS calculated the Secretary would have otherwise provided if OJS would have directly operated FBIC's law enforcement program.

21. The record therefore establishes that OJS had valid grounds for partially declining the FBIC 2018 contract proposal for law enforcement.

22. The statute of limitations for FBIC's claims is six years. 28 U.S.C § 2401. FBIC claims that predate 2016—e.g., claims related to the 1999 TPA allocation and OJS's allocation of funding in 2000, are barred by the six-year statute of limitations.

23. Based upon 25 U.S.C. § 5325(a)(1) of the ISDEAA, which provides that the funding for direct program expenses transferred pursuant to an ISDEAA contract "shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract," the OJS is required to *accurately* determine what the Secretary of Interior through the BIA would have spent to operate a direct service law enforcement agency.

24. OJS Deputy Director Kevin Martin testified that OJS applies the same funding methodology to all tribes, both contracting tribes and direct service agencies, for unrestricted funding increases allocated by Congress. This funding methodology uses a funding formula applying weighed criteria, which includes consideration of each tribe's land base.

25. In determining what the Secretary of Interior through the BIA would have spent to operate FBIC law enforcement as a direct service agency, (Secretarial Amount), OJS's funding methodology required OJS to utilize FBIC's accurate land acreage.

26. OJS acknowledges it utilized inaccurate land acreage in applying its funding methodology to FBIC for the unrestricted funding increases provided by Congress over the base amount for FY2022 and FY2023. As such, OJS's determination of the Secretarial Amount for these fiscal years was impacted.

27. OJS's error in applying its funding methodology utilizing the incorrect land acreage in its determination of FBIC's Secretarial Amount for FY2022, and FY2023, reduced the funding FBIC was entitled to receive for additional unrestricted increases appropriated by Congress for these years. This error was carried over to the Secretarial Amount calculated for FBIC for the FY 2024, 2025, and 2026.

28. By utilizing an incorrect land base for FBIC for the FY 2022 and FY 2023, that carried over to FY 24-26, OJS failed to provide an accurate determination of what the Secretary of Interior would have spent to operate a direct service law enforcement agency for these fiscal years as required by 25 U.S.C. 5325(a)(1) of the ISDEAA. Accordingly, Defendant, United States, who established the OJS under the Indian Law Enforcement Reform Act of 1990, breached their statutory duty pursuant to 25 U.S.C. 5325(a)(1) of the ISDEAA.

29. By failing to satisfactorily comply with 25 U.S.C. § 5325(a)(1), Defendant, the United States through the Bureau of Indian Affairs (BIA), who has provided the OJS with authority to contract with federally recognized tribes for law

enforcement services, breached the funding amount provision of FBIC's self-determination contract through OJS's use of an inaccurate land incorrect land base for FBIC for the FY 2022 and FY 2023, that carried over to FY 24-26.

30. FBIC has failed to establish liability for any other named Defendants.

31. FBIC is entitled to damages in the amount of the difference between what OJS should have allocated to FBIC through applying the correct Secretarial Amount, utilizing FBIC's accurate land acreage under its funding formula for unrestricted increases appropriated by Congress for FY2022, FY2023, and what it did allocate to FBIC for these fiscal years utilizing the incorrect land acreage. FBIC is also entitled to damages, for the compounding impact this error had on FBIC's Secretarial Amount for the FY 2024, FY 2025 and FY 2026. This amount determined by OJS' expert, including an increase in additional base funds in the amount of $38,804.00, additional funding due to one-time funding increases in the amount of $42,177.00, and contract support funds in the amount of $48, 644.00 totals $129,625.00.

31. 25 C.F.R. § 900.228 provides that if an Indian tribe or tribal organization wins the claim, it will be entitled to interest on the amount of the award . . . The interest rate will be the rate which the Secretary of the Treasury sets for the Renegotiation Board under the Renegotiation Act of 1951, Public Law 92-41. The

Court accepts OJS' expert interest calculation in the amount of $21,574.00, finding its methodology complies with this provision.

32. The total amount of damages awarded to FBIC is $129,625.00, plus interest in the amount of $21,574, for a total award of $151,199.00.

**ORDER**

Accordingly,

Defendant United States of America is ordered to pay FBIC $151,199.00.

DATED this 17th day of November 2026.

John Johnston
United States Magistrate Judge